SUSAN M. CHEHARDY, Judge.
[2On October 20, 2005, the Jefferson Parish Grand Jury indicted defendant, William M. Patterson, for second degree murder, in violation of La. R.S. 14:30.1. Defendant pled not guilty at his arraignment. Thereafter, defendant filed a Motion to Suppress Statement, which was denied after a hearing on March 23, 2007. Defendant proceeded to trial on November 17, 2009, and a unanimous twelve-person jury found him guilty as charged on the following day.
On December 2, 2009, defendant filed a Motion for a New Trial, which was submitted without argument and denied by the trial court that day. Thereafter, defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant orally noted that he was going to file a motion to reconsider sentence and a notice of appeal. That same day, defendant filed a written motion to reconsider sentence and a written notice of appeal. On the following day, defendant’s motion to reconsider sentence was denied, and his appeal was granted.

J¿FACTS

At approximately 1:00 a.m. on July 19, 2005, the Jefferson Parish Sheriffs Office received a 9-1-1 call about a shooting at an apartment complex on Whitney Avenue in Jefferson Parish.[1] Detective David Craig Kaehtik and Sergeant Eddie Klein of the Jefferson Parish Sheriffs Office, among others, responded to the call.
Upon their arrival, Detective Kaehtik and Sergeant Klien testified that they observed a young black man, lying motionless, on the ground next to a white car. The victim was identified by bystanders as Tyrone Kayron Temple. The victim, who had sustained multiple gunshot wounds, died at the scene. The officers observed that the white car,[2] with its passenger door *144 ajar, had struck a fence between two of the apartment buildings in the complex.
At the crime scene, Detective Kachtik spoke with Precious Henderson, who had called 9-1-1 after hearing gunshots. She told Detective Kachtik that the driver of the car was shot then his car struck the fence. She also admitted that she turned off the car’s engine and removed the keys from the vehicle.[3]
Crime scene technicians recovered a fragment of a projectile from the vehicle and four spent .380-caliber shell casings from the scene, including one found underneath the body. Sergeant Klein also found blood on the driver’s side of the vehicle, which continued toward the passenger side.[4] Additionally, the officers noted that the driver’s side window of the vehicle was shattered with most of the glass outside of the vehicle. Sergeant Klein testified that the scene suggested that a projectile was shot from the passenger’s side of the vehicle toward the driver’s side.
|4Pr. Susan M. Garcia, an expert in the field of Forensic Pathology, performed an autopsy on Tyrone Kayron Temple on July 19, 2005. Dr. Garcia stated that the autopsy revealed that the victim sustained five gunshot wounds: four to his head and one to his right hand. The victim also sustained graze wounds on his left forearm and his right thumb. Thus, Dr. Garcia concluded that the victim was shot six or seven times.
Further, Dr. Garcia opined that the victim’s hand wound, the graze wound to the thumb, and the graze wound to the left forearm were sustained when the victim was in a horizontal, instead of an upright, position. Dr. Garcia testified that the wounds to the victim’s hands could be considered defensive wounds.
Dr. Garcia testified that the wound on the right side of the victim’s head between his eye and ear was potentially lethal because the victim would have breathed in large amounts of blood from this wound. She believed that this wound was sustained when the victim was in a seated position.
Dr. Garcia testified that the victim sustained a second lethal wound to the right side of his head because the projectile went down into his chest cavity and injured his left lung. She believed that this wound was sustained when the victim was bent over in a “highly angled position.” None of the other wounds were immediately lethal.
Sergeant Rodney Naumann of the Jefferson Parish Sheriffs Office testified that he received projectiles from Dr. Garcia, including one from the victim’s left chest cavity. Sergeant Naumann testified that he also received a blood-stained, white t-shirt, which had been removed by the coroner from the victim’s body. He testified that, before the autopsy began, he performed a gunshot residue test on the victim’s hands. The results were presumptively negative, which indicates that it | Swas unlikely that the victim’s hands were in close proximity to a firearm being discharged.
Lieutenant Kelly Carrigan of the Jefferson Parish Sheriffs Office crime lab assisted in processing the crime scene in question. Lieutenant Carrigan testified that no usable fingerprints were found on the casings recovered from the scene.
Ms. Louise Walzer, an expert in the field of Firearms Analysis, testified that she *145 examined ballistic evidence recovered in this case. She testified that the fired cartridge cases and the copper-jacketed projectile, which had been removed from the victim’s left chest cavity, were consistent with a .38-caliber class.
She concluded that, based upon microscopic analysis, all of the recovered casings were fired from the same weapon. Furthermore, her analysis indicated that the recovered projectiles were fired by the same weapon. Ms. Waltzer admitted, however, that, without a weapon to use for comparison, she could not verify that the same weapon fired both the projectiles and the casings.
On the day following the shooting, defendant turned himself in to officers at the Detective Bureau of the Jefferson Parish Sheriffs Office. At 5:30 p.m. on July 20, 2005, minutes after defendant arrived, defendant, with the help of Detective Ro-drigue, executed a “Rights of Arrestee” form. The form was signed by the defendant and Detective Rodrigue, as well as a witness, Sergeant Dax Russo. Detective Rodrigue read defendant his rights, defendant waived those rights, and, at 5:46 p.m., defendant gave a taped statement. That taped statement was played for the jury.
In defendant’s statement, he said that his mother brought him to the Investigations Bureau. He stated that he walked up to the front desk and told the |6officer that he was wanted for murder. Defendant admitted to killing “Kayron”[5] Temple. He explained that he had known Kayron since they both had attended George Cox School. Defendant also admitted that he and Kayron did not like each other.
Also in his statement, defendant explained that he had animosity toward Kay-ron because, on July 11, 2005, Kayron had robbed the defendant at gunpoint. Defendant said that Kayron put a gun to his head, took his money, his designer jeans, and his tennis shoes, and ran off. He explained that he did not report the robbery to the police because he did not want to look like a “punk” or a “rat.” He also was concerned about retaliation from Kay-ron and his friends.
Defendant further admitted that, after he was robbed on July 11, he purchased a loaded .380 automatic handgun for protection. He said he had the gun on the night of the shooting because he was “hustling,” which he defined as selling drugs. He said he did not expect to see Kayron that night. However, at about 12:50 a.m., defendant saw Kayron drive into the parking area of the apartment complex by “the cut.” That night, Kayron was driving a white car with black-tinted windows.
In his statement, defendant reported that, after Kayron pulled into the parking area, he did not get out of his car. Defendant, in an attempt to “start something” and “make [Kayron] tell me something crazy to make me mad,” contemptuously told Kayron to run an errand for defendant. Although defendant stated that Kayron reportedly declined his request, saying “[h]e don’t ride with no p* * *y ass n* * * * *s in his car,” defendant stated that Kayron left to purchase a cigar for defendant’s associate.
1 ^Defendant stated that, after Kayron left, he went to get his gun, which was hidden in the “lil board on the side the house.” Defendant also told his associates to walk away because he thought that he was going to argue with Kayron when he returned. Defendant reported that Kay-ron returned with the cigar but did not get out of the car.
*146 Defendant stated that his associate took the cigar from Kayron through the vehicle’s passenger door. Immediately thereafter, defendant stepped up to the open passenger-side door and shot Kayron five or six times. Although defendant knew that the shots he had fired had struck Kayron, he did not look at Kayron’s face so he did not know whether Kayron was bleeding.
Defendant reported that, after Kayron was injured, his car began to move forward and eventually collided with a nearby fence. After the shooting, defendant and his associates ran off. Defendant said that he ran to the end of Whitney Avenue then walked to the Algiers’ levee near the ferry. There, he hurled the gun as far as he could into the Mississippi River. He also threw away the clothes that he was wearing at the time of the shooting.
Defendant also testified at trial. He said that he was 17 years old when he was arrested. At that time, he was a Special Education student in the 10th Grade at West Jefferson High School. He testified that he knew the victim from when they went to elementary school at George Cox.
At trial, defendant explained that Kay-ron robbed him on July 11, 2005. He did not report that crime because he “ain’t want to be labeled as a rat, and when people be telling on people they be getting kilt.” He also stated that he did not tell the police about the robbery because they would have arrested the victim, who would have retaliated by trying to kill him or his family. Defendant testified that he did not have a gun on July 11, 2005.
|8When questioned about the evening that he shot Kayron, defendant testified that he was “sitting on the air condition” and “hustling.” Defendant testified that Kayron walked through “the cut” of the apartments and then came back out with a gun in his hand. Defendant reported that Kayron poked him in the head with a .40-caliber gun and ordered him to “Give it up.” Defendant said that he recognized it as the same gun that Kayron had used when he had previously robbed defendant.
Defendant testified that he again gave up his property and cash to Kayron. Then, while Kayron was walking back to his car, defendant retrieved his gun, ran to the passenger side of the vehicle and shot Kayron. He said that he did not mean to kill the victim, but he “just kind of lost it. After I squeezed the first time, I just kind of lost it and kept squeezing. I ain’t know.” He agreed that the victim was not pointing a gun at him at the time. Defendant also agreed that he was mad and wanted his money back, so he shot him in the head.
Defendant testified that he was afraid of the victim. Yet, he did not tell the police that he had been scared of Kayron because he did not want to seem like a “punk.” He admitted that he was young and made “stupid decisions.”
Defendant also stated that he was mad when he gave the statement to the police. Defendant admitted that he lied when he said that two of his friends were with him on the night that Kayron was shot. Defendant said he was given details of the incident and was interviewed prior to when the tape was turned on.
After hearing all of the testimony and evidence, the jury unanimously found that defendant was guilty of second degree murder for the homicide of Tyrone Kayron Temple. Defendant appeals that verdict.
In his first assignment of error, defendant argues that the evidence was insufficient to support the verdict as the evidence did not prove beyond a reasonable doubt that the homicide was not done in self-defense. Defendant does [flnot contest the State’s evidence that he fired the gun at *147 the victim and caused his death. Rather, he argues that the unrebutted evidence presented at trial suggests that the homicide was justifiable because it was done in self-defense. Defendant claims he had a reasonable apprehension for losing his life or suffering great bodily harm when the victim had robbed him at gun point a week earlier and then again on the night of the shooting. Defendant concludes that no rational fact-finder could have concluded, on the evidence presented at trial, that the State proved beyond a reasonable doubt that the killing was not justified as an act of self-defense.
The State responds that the jury reasonably could have concluded that defendant could not have believed he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary under the circumstances to save himself. The State explains that, even if the victim was initially the aggressor, the jury could have believed at some point defendant became the aggressor when he followed him to his car instead of allowing him to escape. The State also notes that one of the wounds entered the back of the victim’s head.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005) (quotation omitted). Both the direct and circumstantial evidence must be sufficient to support ]inthe conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1; State v. Lewis, 05-170, p. 8 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277. In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant’s identity as the perpetrator. State v. Draughn, 05-1825, p. 8 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551, p. 6 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926.
In the instant case, the State proceeded under the first theory of second degree murder. As such, to prove second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. State v. Pagan, 04-1478, p. 10 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441, writ denied, 05-2003 (La.2/17/06), 924 So.2d 1013.
Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
*148 “The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with spe-cifíc luintent to kill.” State v. Gonzalez, 07-449, p. 8 (La.App. 5 Cir. 12/27/07), 975 So.2d at 8, ivrit denied, 08-0228 (La.9/19/08), 992 So.2d 949. Moreover, specific intent to kill can be inferred from the intentional use of a deadly weapon, such as a knife or a gun, State v. Knight, 09-359, p. 14 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317, from the circumstances and the defendant’s actions, and the extent and severity of the victim’s injuries. State v. Graves, 99-113, p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, unit denied, 99-3013 (La.3/31/00), 759 So.2d 68. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. Gonzalez, 07-449 at 9, 975 So.2d at pp. 3, 8.
We find that, given the evidence produced at trial, the jury could have reasonably inferred that defendant had specific intent to kill or inflict great bodily harm. The State presented evidence that defendant shot the victim multiple times. Further, Dr. Garcia testified that the victim sustained five gunshot wounds, with three wounds to his head. She believed that the perpetrator fired at least six shots, and, possibly, even seven. Thus, the State did present sufficient evidence to prove the elements of second degree murder.
Notably, defendant does not deny that he shot the victim, but insists that he acted in self-defense. His claim is actually that the prosecution failed to prove, beyond a reasonable doubt, that the homicide was not in self-defense.[6]
When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Brown, 414 So.2d 726, 728 (La.1982); State v. Theriot, 07 pp. 12-13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, unit denied, 07-1598 (La.2/1/08), 976 So.2d 715. The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18.
According to La. R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger” or “[w]hen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.”[7]
*149 A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. State v. Mills, 04-489, p. 7 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06), 920 So.2d 235 (citing La. R.S. 14:21). In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Theriot, 07-71 at 13, 963 So.2d at 1020.
11sThe determination of a defendant’s culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. Theriot, 07-71 at 12, 963 So.2d at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. Theriot, 07-71 at 13, 963 So.2d at 1020.
The trier-of-fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Singleton, 05-622, p. 7 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, 651. It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence. Id.
Here, the State, beyond a reasonable doubt, adequately negated the defense of justification. At trial, defendant testified that, after the victim arm-robbed him of his money and drugs,[8] the victim walked toward his vehicle. Defendant admitted that, after the victim walked away, he retrieved his gun, ran toward the victim’s car, opened the passenger-side door, and shot the victim. Although defendant did state that he was afraid of the victim, he also stated that he shot the victim in the head because he was mad and wanted his money back.
Further, the victim sustained wounds to his hands that Dr. Garcia testified could be considered defensive wounds. Defendant admitted that the victim was not pointing a gun at him at the time of the shooting. Also, no gun was found at the scene on the victim.
“The law does not permit an individual to track down his enemy, shoot him with a pistol, and then claim justification for the homicide because of prior 114threats.” State v. Arabie, 496 So.2d 554, 558 (La.App. 1 Cir.1986), writ denied, 502 So.2d 565 (La.1987).
Furthermore, the State presented evidence that victim was shot in the back of his head, which indicates that the defendant became the aggressor and his claim of self-defense was not supported by the facts. See State v. Favorite, 03-425, p. 9 (La.App. 5 Cir. 11/25/03), 862 So.2d 208, 214, writ denied, 03-3529 (La.4/23/04), 870 So.2d 298. Further, defendant’s actions after the incident, including failure to report the shooting, disposal of the weapon, and flight from the scene, were inconsis *150 tent with a theory of justifiable homicide. See State v. Wallace, 612 So.2d 183, 191 (La.App. 1 Cir.1992), writ denied, 614 So.2d 1253 (La.1993). A defendant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Cazenave, 00-183, p. 13 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151.
Accordingly, we find that any rational trier of fact could have reasonably concluded that defendant did not support his claim that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary under the circumstances to save himself. Accordingly, we find no merit in defendant’s argument.
In his second assignment of error, defendant argues that the evidence was insufficient to support a verdict of second degree murder but rather supports a verdict of manslaughter. Defendant argues that, in the event that this Court rejects his claim of self-defense, the evidence established that the shooting was done in “sudden passion” and “heat of blood.” He claims that the shooting was provoked by the victim’s violent and lawless behavior and that having been robbed at 11Bgunpoint twice by the victim was sufficient provocation to have triggered mitigatory “heat of passion.”
The State responds that, in viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found the requisite specific intent to kill or inflict great bodily harm, and, also, that the mitigatory factors of manslaughter had not been established by a preponderance. The State concludes that the jury heard the defense’s attempt to persuade it to return a manslaughter conviction by means of its closing argument, but rejected the manslaughter verdict, finding the provocation insufficient to deprive an average person of self-control and cool reflection.
Manslaughter is a homicide, which would either be first or second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. State v. Dressner, 08-1366 (La.7/6/10), 45 So.3d 127 (citing La. R.S. 14:31(A)(1)). Additionally, the defense has the burden of proof of mitigating circumstances by a preponderance of the evidence. Dressner, supra; State v. Lawson, 08-123, p. 8 (LaApp. 5 Cir. 11/12/08), 1 So.3d 516, 523. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. Lawson, supra (citing La. R.S. 14:31(A)(1)).
Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigatory factors that may reduce the grade of the offense. Lawson, supra.
Whether sufficient provocation existed for the reduction of the offense to manslaughter is a question to be determined by the jury under the standard of the 11 (¡average or ordinary person, one with ordinary self-control. Lawson, supra. It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Christian, 07-684, p. 5 (La.App. 5 Cir. 3/25/08), 984 So.2d 132, 135. The question for this Court on review is whether a rational trier of fact, viewing the *151 evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Lawson, supra (citing State v. Lombard, 486 So.2d 106, 111 (La.1986)).
Our review of the instant record does not reveal that the defendant’s homicidal actions were the result of immediate provocation sufficient to deprive an average person of his self-control and cool reflection. First, the defense failed to demonstrate a sufficient level of provocation stemming from the victim’s first armed robbery of the defendant, which was a week before the shooting. See State v. Gant, 06-282, p. 10 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1112, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599 (one week sufficient time for blood to cool); State v. Crochet, 96-1666, p. 11 (La.App. 1 Cir. 5/9/97), 693 So.2d 1300, 1307-08, unit denied, 97-1547 (La.11/21/97), 703 So.2d 1305 (two days sufficient time for blood to cool). Under these circumstances, defendant failed to carry his burden of proof of “sudden passion” or “heat of blood” based on the preceding week’s robbery.
Next, although he did not mention it in his statement, defendant testified that the victim robbed him at gunpoint just before the incident in question. However, the evidence presented still does not support the claim that defendant shot the victim in “sudden passion” or “heat of blood.” Defendant himself testified that the 117victim was leaving when defendant ran to retrieve his gun. He admits that he followed the victim, until he entered his vehicle then shot him.
In Arabie, supra, the defendant admitted that he pursued his armed robbers with the express goal of regaining possession of the stolen marijuana and stolen money. The Arabie court provided the following:
There exists little doubt that defendant was frustrated by his apparent failure to avenge the wrong done to him. Defendant resorted to self-help in an illegal enterprise dependent upon self-help for enforcement of property rights.
Considering all surrounding circumstances and conditions, a rational trier of fact could have concluded that, despite some evidence of provocation, defendant acted with deliberation and reflection and not from heat of passion at the time of the actual homicide. Our law may extend some limited indulgence to passion justly excited, but it does not indulge revenge.
Arabie, 496 So.2d at 558 (emphasis added). Considering the facts and law, defendant again failed to carry his burden of proof of “sudden passion” or “heat of blood” based on the robbery immediately preceding the incident.
Additionally, the jury could have chosen not to believe defendant that the victim robbed him just prior to the shooting, especially in light of the fact that the story given by defendant at trial was different than the version of his story given in his statement the day following the shooting. Such a credibility determination should not be reweighed on appeal. Singleton, OS-622 at 7, 922 So.2d at 651.
In this case, the jury did not find that defendant established the mitigatory factors of “sudden passion” and “heat of blood” by a preponderance of the evidence. We conclude that finding was reasonable based on the evidence presented at trial.
Considering the circumstances of this case, defendant’s actions, and the extent and severity of the victim’s injuries, we find that the evidence was constitutionally sufficient to support the jury’s finding that defendant had the 11sspecific intent to kill or inflict great bodily harm on the victim. *152 Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction and that the mitigatory factors of manslaughter were not established. As such, we find no merit in this argument.

ERROR PATENT DISCUSSION

We have reviewed this record for errors patent, according to La.C.Cr.P. art. 920. Our review reveals that the trial court failed to observe the 24-hour delay between denying defendant’s motion for new trial and imposing defendant’s sentence as required by La.C.Cr.P. art. 873.
Here, the defendant did not expressly waive the mandatory, statutory delay between the trial judge’s ruling on his motion for new trial and his sentencing.[9] As a rule, when a defendant challenges a non-mandatory sentence and the delay is not waived, his sentence must be vacated and the case remanded for resentencing. State v. Sims, 02-1244, p. 10 (La.App. 5 Cir. 4/29/03), 845 So.2d 1116, 1122, writ denied, 03-2189 (La.8/20/04), 882 So.2d 570.
However, absent a showing of prejudice from the failure to afford the statutory delay, reversal of a prematurely-imposed sentence is not required. State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). In Seals, supra, the Louisiana Supreme Court explained that when there is a mandatory sentence to be imposed, the defendant cannot possibly be prejudiced by the trial court’s failure to observe the delay.
| ,qIn State v. Williams, 09-48, p. 19 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 369, mdt denied, 09-2565 (La.5/7/10), 34 So.3d 860, this Court found that a defendant was not prejudiced by the failure to observe the delay because the trial judge was required to impose a mandatory sentence of life imprisonment at hard labor for the defendant’s conviction of aggravated rape. Thus, this Court determined that the failure to delay sentencing could be deemed harmless.
In the present case, defendant received a mandatory life sentence for his second degree murder conviction. According to Seals and Williams, the defendant has not suffered prejudice from the trial court’s failure to observe the statutory delay and, thus, no remedial action is warranted.
Further, the record reveals a discrepancy between the defendant’s commitment and the transcript regarding the notification of the prescriptive period for filing for post-conviction relief' The commitment simply provides that defendant had “2 years from the date the case becomes final to file for Post Conviction Relief.” However, the transcript reflects a proper advisal pursuant to La.C.Cr.P. art. 930.8. Generally, where there is an inconsistency between the minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, this matter is remanded with instructions to the Clerk of Court for the 24th Judicial District to amend the commitment to accurately reflect the trial court’s proper advisal. In all other respects, defendant’s conviction and sentence is affirmed.

*153
AFFIRMED; REMANDED WITH INSTRUCTIONS.

. The jury heard the 9-1-1 call received in connection with this shooting.

. The registered owner of the white Oldsmobile Alero was the victim’s sister, Lakesha Miller, who testified that her brother was borrowing her vehicle at the time of the shooting.

. The crime scene technician found Precious Henderson’s fingerprints inside of the vehicle.

. The results of DNA samples from inside of the vehicle confirmed that the blood belonged to the victim.

. The record states that the victim's middle name was “Kayron.”

. We note that the jury was not instructed on the defense of justification and the defense did not object to the lack of instruction. Thus, we could find that the defendant’s failure to object waived his right to appellate review. La.C.Cr.P. art. 841. An appellate court need not consider a claim of self-defense raised for the first time on appeal. State v. Jackson, 06-565, pp. 5-7 (La.App. 5 Cir. 12/27/06), 948 So.2d 269, 273-74. However, the defendant did testify at trial that he was afraid of the victim who had robbed him on two occasions, including on the night of the shooting. Further, defense counsel asked the jury to consider if defendant had been provoked, threatened, or scared. In this case, in an abundance of caution, we will review the merits of defendant's allegation.

. Of note, defendant testified that just prior to the homicide he was selling drugs. La. R.S. *149 14:20(A)(4)(b) provides that "[t]he provisions of this Paragraph shall not apply when the person committing the homicide is engaged, at the time of the homicide, in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the provisions of the Uniform Controlled Dangerous Substances Law.” Again, in an abundance of caution, we will address defendant's claim.

. The coroner’s office discovered cash in the victim's pocket. Sergeant Klein believed the amount was $614.00.

. According to the transcript, the trial judge asked, "Are we ready for sentencing?” The State then mentioned that the victim's sister was present to make a victim impact statement. After the statement was made, the trial judge asked, "Does the defense have anything they wish to say?” Defense counsel responded, "No, Your Honor." Thereafter, defendant was sentenced to life imprisonment.