MOORE, J.
11 Louis Alexander appeals his conviction of second degree murder and mandatory life sentence for the brutal slaying of a homeless woman. He urges that the trial court erred in denying his motion to suppress his incriminating statement to police, and that the evidence was insufficient to support the conviction. Finding no merit in these claims, we affirm the conviction and sentence.

The Offense and Initial Investigation

On April 4, 2013, the severely battered body of Deneen Harris was discovered in an alley behind a Monroe hardware store on DeSiard Street. The store owner said that Harris, age 48, had been living in an alcove in the alley for about three months, and he had last seen her two days before her body was discovered. DNA testing of a hair root obtained from the pubic area of the victim’s body identified Louis Alexander as a suspect. To verify this, investigators obtained a search warrant for a reference DNA swab from Alexander and brought him in for questioning.
Alexander gave police a recorded statement in which he eventually admitted that he had sex with Harris the day of her murder. He also admitted that when Harris became combative, he struck her several times in the head with a hard object, again unsuccessfully attempted to have sex with her as she was lying mortally injured on her stomach, and left her bleeding body in the alcove covered with a blanket. DNA testing of Alexander’s reference swab confirmed his DNA on the evidence.
The grand jury indicted Alexander on charges of second degree murder, La. R.S. 14:30.1, and aggravated rape, La. R.S. *35 14:42. The state ^dismissed the aggravated rape charge prior to trial.
Alexander filed a motion to suppress his recorded statement on grounds that it was not freely and voluntarily given because it' was made in a two-hour interrogation initiated for investigation of the ‘unrelated charge of second degree battery.

Hearing on the Motion to Suppress

At the hearing on the motion to suppress, the court heard testimony from Monroe Police Department (“MPD”) Det. Mike Fendall about his May 1, 2013, interview with Alexander. Det. Fendall stated that he learned from' the State Police Crime Lab that DNA evidence, including a pubic hair with root taken from the victim’s body, revealed two DNA profiles. A blood sample confirmed one profile was the victim’s; the second, after being run through CODIS, matched Louis Alexander. The lab requested that a buccal swab be obtained from Alexander so the preliminary match could be confirmed. Det. Fen-dall obtained a search warrant to take a DNA swab from Alexander.
Detective Fendall located Alexander at the DeSiard Street Shelter (“the Shelter”), located down the street from the crime scene. Alexander told the officers that he was 42 years old, had completed high school and taken some business' college classes. He also said he was divorced, had four older children who lived in Las Vegas, and he lived at the Shelter. He was given a rights form stating that'he was under arrest for second degree battery. Det. Fendall read the form aloud, advising Alexander that he had the right to remain silent, that anything he said, whether verbal, written or | ¡¡recorded, could be used against him in court, that he was entitled to an attorney and an attorney would be appointed for him at no cost if he could not afford one, and-that if he decided to make a statement, he could stop at any time. Alexander initialed, each item and signed the form. Det. Susan McMillan joined them for the interview, in which Alexander remained shackled and'handcuffed. Det. Fendall said that Alexander was articulate and appeared to understand the questions asked of him.
After discussing the second degree battery charge, Det. Fendall asked Alexander if he remembered the rights form and was still aware of his rights; he replied, yes. The officer did not state that Alexander was a suspect in' the Harris murder, but that he wanted to talk about another incident, and asked what Alexander knew about the woman found dead in the alley a few weeks before.
Alexander admitted that he knew Harris from the Shelter but denied that he was ever sexually involved with her. After Det. Fendall advised him that the evidence indicated that Alexander was lying, Alexander admitted having sex with Harris. Eventually, Alexander admitted that things got' rough, and that he struck her when she began resisting.
The defense argued that the state’s failure to advise Alexander he was a suspect for murder vitiated the free and voluntary nature of the statement. The state argued that the investigating officer was not required to advise the suspect of the basis for the interrogation for a statement to be freely and voluntarily made, citing State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382. The defense, maintained that the failure to advise an interrogee that |4he was suspected of murder would still be a relevant factor in determining whether the defendant’s statement was free and voluntary, citing State v. Blank, 2004-0204 (La.4/11/07), 955 So.2d 90, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).
*36 The court -ruled that Alexander’s statement to police was freely and voluntarily given and .denied the motion to suppress. The court found ¡that Alexander was advised of his rights, signed the waiver form, and- confirmed that he remembered his rights when the topic changed, and that the detective told Alexander that he wanted to discuss the woman found dead in the alley.

Trial Evidence

Frank Anzalone, the owner of Star Hardware & Furniture on DeSiard Street in Monroe, testified that Harris had lived in the alley on some wooden pallets covered with a mattress for three months. Anzalone said Harris kept the area neat and clean, and did not bother anyone or anything. His employee, Carey Capers, brought Harris coffee and .they allowed her to use the store’s restroom. Anzalone said Harris was very passive but had some mental issues, as he would see her talking to herself and beating on the building in the alley.
Anzalone said that when they noticed Harris’s absence for two consecutive mornings, he and Capers looked and found her facedown on her mattress in the alley, unresponsive and bleeding from the head.
MPD Sgt. Scott Ferguson processed the crime scene, where blood splatter indicated the victim was not standing when she was--beaten. Broken pieces of brick splattered with- blood were found néar the mattress. Two ^pieces of a broken broom were found next to the mattress and another piece of the broom was' found in a nearby Dumpster, along with a used condom. A Louisiana driver’s license identifying the victim as Deneen Harris, her high school diploma and a portion of her birth certificate were found among her personal items. The coroner’s office sent the body to Dr. Frank Peretti, a forensic pathologist, for autopsy.
Dr. Peretti determined that the cause of death was severe head injuries, or cranio-cerebral trauma. Dr. Peretti said Harris suffered seven head lacerations; multiple skull fractures on the top and side of her head; and multiple contusions, bruises and lacerations to her skull. Dr. Peretti said that a hinge fracture to the-skull was a major, devastating injury. A large hemorrhage was observed inside Harris’s skull and pieces of bone were embedded in her brain; the entire left side of her face was swollen and covered in black and blue contusions. Dr. Peretti noted some defensive-type injuries, such as bruises on the back of Harris’s left hand and a superficial laceration on her left second finger. Dr. Peretti stated that Harris’s head lacerations indicated a pattern of being struck with an object that was rectangular, curvy and linear. He concluded that a person receiving these kinds of injuries would be rendered unconscious and would live less than five minutes due to the “pretty devastating neurological injuries.”
Dr. Peretti collected the victim’s clothing and samples for a sexual assault kit. Samples of her fingernail clippings and scrapings, blood, and head and pubic hair were collected and sent for analysis. Dr. Peretti said that the toxicology tests were negative for drugs, both legal and illegal, and [nalcohol. He also noted that Harris had older injuries, contusions on her lower extremities, that were a week or two old and that had begun healing.
Det. Fendall testified that the investigation of the crime scene and canvass of local residents did not immediately reveal any suspects for Harris’s murder. On April 25, 2013, the crime lab informed him that analysis of a pubic hair with root from the combings done by Dr. Peretti revealed the presence of two DNA profiles. Comparison to the victim’s blood sample confirmed one belonged to Harris and the other to *37 Louis Alexander. With this preliminary finding, Det. Fendall decided to take a reference sample from Alexander to confirm the finding.
Alexander was located where he lived, at the Shelter, just down from the crime scene. He agreed to accompany officers to the police station, where he was informed of his rights. ' ■ After signing a waiver of rights form, Alexander gave a recorded statement to Det. Fendall and Det. McMillan. After initially discussing an unrelated charge of second degree battery, Det. Fendall told Alexander that' he wanted to discuss what Alexander knew about the recent death of a local homeless woman, Harris. Alexander’s 2-hour and 7-minute statement was then played to the jury. - ;
In this statement, Alexander, a divorced father of four, said he lived at the Shelter and he had not had sex for several months prior to the murder. He knew of Harris, and said he had assisted her with her clothing at the Shelter and had drinks with her and another man, named Gary. Alexander said that Harris was barred from the Shelter for “talking crazy”; she did not bother anyone but would sometimes have “episodes” where she would yell 17and hit the walls. He knew Harris stayed in the' alley behind- the furniture store and had visited her there. He firmly denied ever having sex with her. He said he heard about her death from someone at the Shelter, and that she had been hit in the head with a brick. Det. Fendall told Alexander he was not being honest and asked why Alexander’s DNA would be found on the victim and the things around her. Alexander said that he would go by and check on Harris and hug her.
Eventually, Alexander admitted that a week or two before the murder, he and Harris had sex. Det. Fendall again told him the evidence would prove he was lying. Alexander then -admitted that he was there the day of Harris’s murder: they were haying sex and, at first, there were no problems, but things “got rough” when they-began to switch sexual positions and she pushed him off her. She then began having one of her episodes and started swinging at him. He shoved her into the wall; she began hollering and kept swinging at him, with something in her .hand. Alexander said she ended up getting hit in the head with that object; he pointed to the right side of his forehead to indicate where she had several severe lacerations. Alexander, said they were on the mattress when he attempted to restrain her by hitting her two or three times in the head; her head started to bleed. He flipped Harris onto her stomach and attempted to have sex with her again, but was unsuccessful. He then left her in that state and covered her with a blue blanket.
. Det. Fendall .testified that in this- statement, Alexander disclosed facts about the crime that had not been released to the public: that the victim had I «been hit on the head with a hard object; the location of the blood splatter on the walls; the position of the body with respect to the mattress; and the that the body had no lower clothing and was covered with a-blue blanket. The rape kit samples, the blanket, the beddiñg; a half brick splattered with blood, and an elastic hair band were sent to the crime lab for' DNA analysis. Rhálie Austin, a forensic analyst with the State Police crime lab, testified regarding the DNA testing and results. She said that Jeremy Dubois, a forensic analyst no longer with the lab, tested the initial evidence' received, finding only one viable profile that identified a source other than the victim — the mixed profile on the pubic hair collected from the victim’s body. This test of the pubic hair with root established that Harris and Alexander could not be *38 excluded as contributors to the DNA profile.
The DNA profiles of both the vaginal and anal swabs, the fingernail clippings and scrapings, and the elastic band were consistent with only the victim. No sperm cells were found, which Austin stated would not be uncommon if the subject did not ejaculate. The DNA test of the blood splatter on the brick was inconclusive because only a partial profile was produced. However, Alexander’s buccal swab provided a match to the DNA profile from the pubic hair. Based on statistical analysis of the profile, Austin was confident that the DNA sample was a match to Harris and Alexander.
With this evidence, the state rested. The defense declined to present any evidence. After arguments, the case was submitted to the jury, which deliberated about one hour before returning a verdict of guilty as charged. 19Polling revealed the verdict was 11-1.
Alexander filed a motion for post verdict judgment of acquittal, arguing that the evidence did not support a finding of second degree murder, and a motion for new trial, on grounds that the verdict was contrary to the law and evidence. The court denied both motions.
At sentencing, the court summarized the “particularly egregious” facts of the case before imposing the mandatory life at hard labor, without benefit of parole, probation or suspension of sentence. This appeal followed.

Discussion; Sufficiency of Evidence

By his first assignment, Alexander argues that the evidence was insufficient to support the conviction for second degree murder, and the court erred in denying his motion for post verdict judgment of acquittal. He argues the evidence supports neither a finding of specific intent to kill or inflict great bodily harm, nor of an enumerated felony (aggravated or forcible rape, or an attempt thereof) that would be required for felony murder. He shows there was no evidence of trauma to the vagina or anus, and no evidence that the victim was held down or restrained; hence, no enumerated felony. He submits the evidence was sufficient to support only a conviction for manslaughter during consensual sex, when Harris began to strike him and he responded by hitting her; this was the immediate provocation depriving him of his self-control and cool reflection, and sudden passion or heat of blood prompted by Harris’s attack after they had consensual sex. He urges this account of what happened is more plausible |inthan the state’s, noting the store owner’s testimony that Harris was seen talking to herself and hitting on the walls, indicating a mental problem. Furthermore, the absence of any medications in the victim’s toxicology reports shows that Harris may have failed to take medicine prescribed for mental illness.
The state counters that the facts support the conviction for second degree murder, as Alexander’s actions showed a specific intent to kill Harris; Alexander failed to meet his burden to prove, by a preponderance, the sudden passion or heat of blood required for a finding of manslaughter; and Dr. Peretti’s testimony about the seven impact sites on Harris’s skull, the devastating neurological injuries and the multiple skull fractures that would produce death in about five minutes, all prove the specific intent.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, *39 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute, its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the Incredibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
La. R.S. 14:30.1 defines second degree murder as the killing of a human being, in pertinent part:
(1) When the offender has a specific intent to kill or to inflict great bodily, harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, [or] forcible or second degree rape, * ⅛ * even though he has no intent to kill or to inflict great bodily harm.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant’s actions. State v. Mickelson, 2012-2539 (La.9/3/14), 149 So.3d 178; State v. Allen, 41,548 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, writ denied, 2007-0530 (La.12/7/07), 969 So.2d 619. Specific intent to kill or inflict great bodily harm, as required to convict for second degree murder,-may be inferred from the extent and severity of the victim’s injuries. State v. Thornton, 47,598 (La.App. 2 Cir. 3/13/13), 111 So.3d 1130; State v. Patterson, 10-1415 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, writ denied, 2011-0338 (La.6/17/11), 63 So.3d 1037; State v. Durand, 07-4 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, writ denied, 2007-1545 (La.1/25/08), 973 So.2d 753. Forensic evidence of blunt-force trauma resulting in both lethal and nonlethal wohnds, bruises and contusions may support a finding of specific intent to kill. State v. Mackens, 35,350 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, writ denied, 2002-0413, (La.1/24/03), 836 So.2d 37.
When a homicide that would be second degree murder under La. R.S. 14:30.1 is committed in sudden passion or heat of blood, immediatély caused by provocation sufficient to deprive an average person of his self-control and cool reflection, the act is considered manslaughter. La. R.S. 14:31 A(l). Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. Id. Sudden passion and heat of blood are mitigatory factors that are defensive in nature, and these factors indicate a degree of culpability less than is present when the homicide is committed without them. State v. Thornton, supra. The defendant must prove, by a preponderance of the evidence, that he acted in .sudden passion or heat of blood in order for manslaughter to be appropriate. *40 Id. Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. State v. Horn, 45,706 (La.App. 2 Cir. 11/3/10), 55 So.3d 100, writ denied, 10-2721 (La.5/6/11), 62 So.3d 124.
Alexander admitted in his recorded statement that he hit Harris in the head with a hard object while straggling with her to have sex. He did not | ^specifically state that the object was a broken brick. He also said that he took from Harris an object that she had struck him with; he described this as being like a piece of wood. He admitted that his intent was to restrain her, and once he had incapacitated her, he proceeded to attempt sex with her as she lay dying and bleeding profusely from the head.
The offense of second degree murder requires specific intent “to kill or inflict great bodily harm.” The evidence shows that Alexander hit Harris multiple times in the head, with enough force to fracture her skull in several places, embedding bone in her brain, causing a large hemorrhage inside her skull, and leaving the entire left side of her face swollen and bruised. Harris' died as a result of. the injuries that Alexander intentionally inflicted on ■ her. The repeated' blows to her head, each brutal enough to cause severe skull fractures, unconsciousness, and death in k matter of minutes, indicate a specific intent to kill or inflict' great bodily' harm. ,
Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of second degree murder beyond a reasonable doubt. This assignment of error is without merit.
Motion to Suppress .
By his second assignment of error, Alexander contends that the trial court erred in denying the motion to suppress his statement to police. He urges that the statement was made under the false pretense that he was under arrest for second degree battery, the charge written on the rights waiver form. He also complains that the interview lasted over two hours, during |uwhich the detective repeatedly told him he was lying and refused to accept any answers that did not fit the officers’ theories, Alexander argues that under the totality of the circumstances, his statement was not free and voluntary, again citing State v. Blank, supra.
The state responds that this claim is without merit because the video of the statement confirms that Alexander was advised of his rights, and he initialed and signed the rights waiver form; he had a high school diploma, some college-level education and appeared to understand the questions presented to him, without confusion; at no time during the over two-hour interview- did he attempt to end the interrogation or invoke his right to an attorney. While the interrogation did indeed start regarding the charge of second degree battery, Alexander was asked and confirmed that he remembered and understood his rights before detectives moved to questions about Harris’s murder.
Before the state may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary, and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La. C. Or. P. art. 703 D; State v. Blank, supra; State v. Simmons, 443 So.2d 512 (La.1983). If a statement is a product of custodial interrogation, the state also must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and that he has a right to counsel, either retained or appointed. Mi *41 randa v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
|-i,-There is no requirement that a defendant be advised he is a murder suspect to make • a knowing and voluntary waiver of his rights. State, v. Blank, supra. However, failure to inform a suspect of the subject matter of interrogation is a relevant factor in reviewing the totality of the circumstances under which a defendant makes an incriminating statement. State v. Cousan, supra,
The length of an interrogation, by itself, is not enough to demonstrate that the defendant’s statement was not volun- . tarily made. In State v. Blank, supra, the court found that a 12-hour interrogation, by itself, , did not render a confession to murder involuntary. In State v. Platt, 43,708 (La.App. 2 Cir. 12/3/08), 998 So.2d 864, writ denied, 2009-0265 (La.11/6/09), 21 So.3d 305, this court found that a five-hour interrogation also did not render the confession involuntary.
Alexander agreed to accompany the officers to the station for questioning, As it was a custodial interrogation, the officers appropriately began by advising Alexander of his rights under Miranda, supra. The officers verified Alexander’s educational background and reviewed the waiver of rights form with him. Alexander listened as each right was read, said that he understood each, and initialed each before signing the full form. When the questioning shifted from the charge of second degree battery, Det. Fendall confirmed with Alexander that he remembered his rights and stated that he wished to discuss another incident, the woman found dead in the alley. At no time did Alexander stop the interview or invoke his rights. Review of the video shows the officers did not coerce Alexander or threaten |1fihim in any way, but merely encouraged him to be honest with them about what happened. The interview stretched to two hours largely because of Alexander’s initial insistence that he did not know the victim or have sex with her, a claim the officers knew to be false because of the DNA test results. The state established that Alexander was advised of his rights before giving his statement. Under the totality of the circumstances, there is no showing that the officers’ conduct in any way vitiated the knowing and voluntary nature of the statement. This assignment lacks merit.

Conclusion

We have reviewed the record in its entirety and find nothing we consider to be error patent. La. C. Cr. P. art. 920. For the reasons expressed, Louis Alexander’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.