JUDE G. GRAVOIS, Judge.
|2Pefendant, Ivory Franklin, has appealed his conviction of second degree murder. For the reasons that follow, we affirm.

FACTS

On the morning of September 14, 2004, defendant was picked up by his friend, Steven Thomas, and brought to Thomas’ apartment on Alex Korman Boulevard on the westbank of Jefferson Parish. Throughout the day, numerous other people were inside the apartment and in the area around the apartment. Defendant and Thomas began drinking alcoholic beverages in the morning. Later, defendant and other men played “Play Station” games. At some point that night, an argument broke out between defendant and the victim, Marcel Cotton. Bystanders separated the men; however, a short time later, another fight broke out involving defendant and Cotton and several shots were fired. Cotton was killed and defendant was wounded. Defendant was indicted for second degree murder. Numerous witnesses testified at trial.
Is The State’s lay witnesses ,
Steven Thomas and Leonise Walkey testified that they lived together at 2241 Alex Korman Boulevard. They both knew the victim and defendant. Various people, including defendant and the victim, were at Thomas’ apartment when an argument ensued between the victim and defendant. Eventually, the victim and defendant were involved in a fight outside the apartment. Walkey, who was watching from a window inside the apartment, observed the victim enter into a white truck and defendant walk away in the opposite direction. The victim told Thomas that he was leaving to retrieve a gun; however, Thomas never observed the victim return with a gun. Thomas testified that Bruce Vernon, one of the victim’s friends, interceded into the altercation between the victim and defendant in that Vernon brandished a .40 or .45 caliber firearm. Thomas “jumped in front of the gun,” and told Vernon “don’t do it.” Vernon smirked and walked away.
After Vernon walked away, defendant asked Thomas for a gun to which Thomas responded negatively. Thomas then went into his residence with his girlfriend, Wal-key, where he later learned there had been a shooting, but did not witness it. Thomas testified that the next day, defendant called him inquiring about what happened because he was drunk at the time and the police were asking him what happened. According to Thomas, defendant explained that he remembered “bits and pieces” and “something about a guy with dreads.”
Penny Cason, who witnessed the shooting, lived at 2305 Alex Korman Boulevard at the time of the incident. She testified *864 that she first witnessed an altercation between four black males outside in the parking lot near Steve Thomas’ apartment at 2241 Alex Korman Boulevard. This altercation involved primarily two of the males, one short and one tall, who were arguing over who won a “Play Station” game. The shorter male, who Cason later identified as the victim, was Rlouder and more outspoken and initiated the altercation. He was also pushing on the taller male, who Cason identified in open court as defendant.
After the altercation, the victim “looked around for a piece of stone or something to hit” defendant with, and after finding an object, he proceeded to do so. Meanwhile, a male with the victim told him: “don’t do that, we got something for him (meaning defendant).” The victim “threw the rock down, and then they walked off.” The victim and his friend walked past Cason. The victim’s friend approached a white Expedition in the street, spoke to the driver, and proceeded back to the apartments. The victim and his friend then “went into a cut,[1] and then proceeded to come back out.” When they returned, the victim passed directly in front of Cason with a gun in his hand continuing toward defendant. After the victim and his friend approached defendant, one of them pointed a gun at defendant; however, Cason was unsure whether it was the victim or his friend who pointed the gun at defendant. Defendant punched the person holding the gun stating: “[N* * *er], that’s all you got?” Defendant then turned his back and the victim and his friend walked off toward Cason, “pissed because they were punked....”[2] As the victim walked by, he told Cason: “[M]ama, we not [sic] going to do nothing right now, I see y’all here.” The victim then “proceeded to the apartments where the cut was,” and defendant entered into a green F150 truck. The truck went down Alex Korman Boulevard, passing the victim, who was located near the apartments at 2309 and 2813 Alex Kor-man Boulevard, and turned left on Sandy Lane, which leads to Max Drive, the street that runs parallel to Korman Boulevard behind the apartments.
| r,Cason testified that at that point, the white Expedition returned and the victim’s friend got inside and yelled to the victim: “My n* * *er, you coming [sic], you coming [sic] my n* * *er,” to which the victim replied: “No, I’m straight, I got this, I’m straight, I’m straight.” The Expedition then drove away. The victim continued to pace back and forth with the gun still in his hand. He later “settled down.”
Cason testified that defendant then approached the victim coming from the back of the apartments, where there was a “cut” or open field that could be reached from the back street, Max Drive, and led to Alex Korman Boulevard. Defendant “shot one time,” as a warning shot and said: “Okay, bit* *, what now, bit* *?” Cason testified: “Then there was just gunfire, da, da, da, da, da, da, da [sic],” and the victim fell.
During the shooting, there was a white vehicle parked in a driveway, which backed out of the spot and drove off immediately after the shooting.[3] After the shooting, Cason observed defendant talking to an unknown male who was in the area during *865 the shooting. Defendant then walked slowly past Cason and looked directly at her with red blood shot eyes.
Cason testified that she called 9-1-1 and attempted to assist the victim, but he was bleeding profusely and had no pulse. After the police arrived, Cason informed a deputy that she needed to talk to them at another location because she feared retaliation. Cason was later interviewed by police where she identified defendant in a photographic line-up.
Michael Rodrigue testified that he was friends with the victim and Bruce Vernon. Rodrigue noticed a fight between two people near Steve Thomas’ apartment. He walked to that area and observed the victim walking away while ^defendant and Vernon were “passing words.” Vernon then approached defendant with a semiautomatic handgun. Eventually, Vernon left the area and defendant asked for a telephone.
Subsequently, Rodrigue encountered Vernon, who was still armed, and the victim, who was then armed with a .38 caliber gun that belonged to Rodrigue’s girlfriend’s brother. Rodrigue testified that Pat, whose last name he did not know, drove up in a white Expedition disclosing that he saw the people that were previously arguing with the victim and Vernon exiting an F-150 on Sandy Lane and walking on Max Drive.[4] Vernon left in the Expedition and the victim remained standing next to Rodrigue’s driver’s side window, talking to him, while he was sitting in his car. Although Rodrigue offered the victim a ride, the victim refused because he had left his cellular phone at Thomas’ apartment.
Rodrigue testified that he observed defendant, armed with two weapons,[5] exit the alleyway with guns. Defendant was followed by a second armed man. At that point, “everybody” (defendant, the second individual, and the victim) started shooting. Rodrigue did not know who fired first, nor did he observe the victim fire his weapon. However, he admitted that he had previously declared that defendant shot first in his 2004 statement as well as to the district attorney’s office a few years later.
Rodrigue testified that he remained in his vehicle during the gunfire; however, he drove away once the second perpetrator saw him and began shooting at him. Subsequently, the police searched his vehicle.
|7On cross-examination, Rodrigue testified that he did not know who the aggressor was in the incident. He did not see defendant fire a warning shot, rather defendant entered onto the scene and just started shooting.
Bruce Vernon testified that he was friends with the victim. He was on Alex Korman Boulevard on the night of the incident visiting his girlfriend, who lived in a nearby apartment. He drove a Mazda 626, which was located at the scene of the murder. There was a .40 caliber firearm located near the tire of Vernon’s vehicle; however, he testified that it was not his weapon nor was it the weapon recovered from his previous firearm conviction. Vernon admitted that in a previous interview with the State, he denied having any knowledge about the victim’s murder be *866 cause he went to the gas station and when he came back, his friend was dead. At trial, Vernon denied playing “Play Station” inside of Thomas’ apartment on the day of the incident, as well as any involvement in a fight with defendant. Vernon testified that neither himself, the victim, nor any of the victim’s friends were armed on the day of the incident.

The State’s police witnesses

Deputy Nick Davidson of the Jefferson Parish Sheriffs Office testified that he was dispatched to 2313 Alex Korman Boulevard, but was re-routed to Destrehan Avenue and Lapalco Boulevard to respond to a call. There he found defendant sitting inside of a vehicle apparently suffering from a gunshot wound. Defendant declared that he was shot by an “unknown male.”
Once Davidson was finished at the scene with defendant, he proceeded to the 2300 block of Alex Korman Boulevard. Upon arriving, he observed the victim lying beside a vehicle, with multiple gunshot wounds. Davidson testified that there were two handguns lying near the victim, both were on his left, one resting near his feet. A third pistol was found in the grass further down the street, in front of | ^another building. Davidson notified the detective’s bureau, the crime lab, and secured the scene.
Detective David Morales, testified that he assisted in the homicide investigation in the 2300 block of Alex Korman Boulevard. After arriving on the scene, he was subsequently given directions to visit another scene on Destrehan Avenue, under the Lapalco Bridge in Harvey, where a person was shot.
Emergency medical technicians had cut off defendant’s clothing to provide medical assistance for multiple gunshot wounds so the clothing was collected as evidence and photographs were taken at the scene.
Morales proceeded to Charity Hospital to interview defendant, unaware that the shooting on Destrehan Avenue was related to the shooting on Alex Korman Boulevard. Defendant had gunshot wounds in the left forearm, wrist, and ankle. His right shoulder was also injured. Defendant informed Morales that he previously had “a few drinks”; however, Morales asserted that defendant appeared to be “very coherent.” Defendant cooperated with Morales and stated that he was looking for his friend, Thomas, in the 2300 block of Alex Korman Boulevard when he heard someone say: “Give it up mother fu**er.” Then, he heard gunshots and noticed that he was injured so he went to the corner and found someone to take him to the hospital. Defendant denied having a weapon or firing one, however, a gunshot residue (GSR) test was performed on defendant’s right hand and the result was positive, revealing that defendant had fired a weapon.
Detective Roger Gorumba testified that he was the lead investigator in a shooting that resulted in a homicide in the 2300 block of Alex Korman Boulevard. When he arrived on the scene, the victim was lying in the parking lot of 2313 Alex Kor-man Boulevard, having received multiple gunshot wounds. There was a blood trail at the scene, along with three firearms (a .38 caliber revolver, a .40 caliber 1 flhandgun, and a .357 magnum), ballistic evidence, and bullet casings (including eight 9-mm casings), which were recovered from the scene and collected as evidence. There was no evidence that the .40 caliber weapon was fired on the scene. The casings revealed the use of an additional 9-mm weapon at the scene by an unknown perpetrator, which was never recovered. Both of the victim’s hands tested presumptively positive for gunshot residue.
*867 Gorumba testified defendant was developed as a suspect through investigation and subsequent eyewitness identification.[6] When Gorumba met with defendant to take a statement, defendant declared that he had no recollection of the incident outside of hearing a loud bang, which was different from his earlier statements to police after the incident. Gorumba terminated the interview and did not speak with defendant again until after defendant was arrested.
Gorumba obtained a recorded statement from defendant after his arrest. In this statement, which was played for the jury, defendant declared that he was “drinking” at his friend, Steve Thomas’, apartment, and when he stepped outside, he was involved in an altercation with the victim where he was punched in the face. The victim then “broke out running” and jumped into a white Expedition exclaiming “this is how it’s about [sic] to be,” then one of the victim’s friends assaulted defendant with an automatic weapon. The second subject and defendant then engaged in a “tussle”; however, it ended when the second subject backed up and walked away. Defendant walked down the street in the opposite direction in attempt to leave the area. Someone offered to bring defendant home; however, he declined the offer because he did not know the person.
Imln his statement, defendant asserted that two individuals, one being the victim, “came from ... on side the building” and “ran up” on him armed with weapons, one from his right side and the other from his left side. He engaged in a struggle for the second subject’s gun when he heard a gunshot. At that time, he successfully retrieved the gun, which was a revolver, and observed the victim shooting at him. Defendant then shot the victim and ran away. Defendant’s wrist, back, and leg were injured during the incident. An unknown woman agreed to drive defendant to the hospital; however, when she came upon a police officer, she asked him for assistance.
Gorumba explained that a bullet was recovered from defendant at the hospital and collected as evidence. Also, after obtaining a search warrant, Michael Ro-drigue’s vehicle was searched and a bullet was recovered from the one of the interior doors.
On cross-examination, Gorumba admitted that he previously stated that the .38 caliber five-shot revolver was recovered from the victim’s hand; yet, he later learned after talking to the first officer on the scene that he was mistaken and the gun was found in close proximity to the victim, near one of his legs, rather than in his hand. However, there was no doubt that the victim discharged a weapon and the 9-mm revolver was fired by someone other than defendant. Gorumba further testified that the .357 magnum was recovered along the blood trail, having been dropped by defendant as he was fleeing the scene.

The State’s expert witnesses

Doctor Karen Ross, an expert in forensic pathology, testified that she performed an autopsy on the victim and determined that he died as a result of at least 17 gunshot wounds, including entrance and exit wounds. Dr. Ross concluded that the victim had been shot at least 12 times. Based on the downward paths of | nseveral of the entrance and exit wounds, some of which entered in the victim’s back and exited through the front chest area, Dr. Ross was able to determine that the victim *868 was either bent over or lying down at the time they were inflicted. One projectile and several bullet fragments were recovered from the victim’s body. An additional projectile was also recovered from the body bag after the victim’s clothing was removed. These projectiles and fragments were turned over to the crime lab.
Timothy Scanlan, the Crime Lab Director for the Jefferson Parish Sheriffs Office, testified as an expert in firearms and toolmarks examination, blood stain pattern analysis, and crime scene reconstruction. Scanlan examined three firearms recovered from the scene: a .38 caliber revolver, a .40 caliber Smith and Wesson, and a .357 magnum Taurus, as well as the projectiles and fragments. The .38 caliber revolver was discovered with fired cartridge casings still within it. Because a revolver does not eject its casings after it is fired, Scanlan concluded, after further testing for verification, that five shots were discharged from the .38 caliber revolver. Scanlan testified that although there were no projectiles matching the .38 revolver at the scene, the projectile recovered from defendant matched this revolver. Scanlan concluded that the .40 caliber Smith and Wesson was never fired at the scene, because eleven cartridges or bullets were recovered from the weapon, meaning that it was fully loaded.
Five fired cartridge casings were found in the .357 magnum Taurus that was recovered along a blood trail; therefore, Scanlan concluded, after further testing for verification, that the .357 magnum also fired five shots. A bullet fragment found near the victim also matched the .357 magnum. Other fragments recovered from the victim’s body were too small to match to a particular weapon; however, they could not be excluded as coming from one of the weapons, other than the .40 |1gcaliber which was not fired. On cross-examination, Scanlan admitted that no fragments recovered from the victim’s body were matched to the .357; however, he noted that the victim had exit wounds.
Two projectile fragments were later recovered after a search warrant was executed on Rodrigue’s vehicle. One of those projectile fragments also matched the .357 magnum. Scanlan noted that the vehicle contained at least two bullet holes, and possibly a third.
In addition, Scanlan testified that the blood trail was indicative of a person fleeing the scene. He noted that the .40 caliber Smith and Wesson revolver was lying at the scene near the point where the blood trail began and there was a drop of blood under the trigger guard of this gun demonstrating that a drop of blood fell before the gun.
All of the recovered firearms were unsuccessfully tested for fingerprints. GSR tests on both the victim and defendant were positive. DNA samples, which included “blood-like substances,” were also collected from the weapons for further testing.
Ann Montgomery, an expert in DNA analysis, testified that samples from the frontstrap and slide release of the .40 caliber revolver and from the backstrap of the .357 magnum were consistent with defendant’s reference sample. She explained that this means that defendant could not be excluded as the person whose DNA was on these weapons. Following Ms. Montgomery’s testimony, the state rested.

Defendant’s witnesses

Captain Steve Buras, who was the Commander of the Homicide Division at the time of the incident, testified that he responded to three separate inquiries from insurance companies in reference to the victim’s death. In response to those *869 | ^inquiries, Buras wrote that “Cotton [victim] who was armed with a gun was one of several aggressors during the incident.” His responses also indicated that the victim was in possession of a handgun when found by the responding officers, and that the victim got into a verbal confrontation which escalated when handguns were produced and he and the suspect began firing at one another. Finally, Buras testified that he responded to another inquiry in the following manner: ‘Tes, attempted murder if he had survived.”[7] Buras explained that he would have responded to the answers based on his own knowledge or on the knowledge of another investigator involved in the case. However, on cross-examination, Buras admitted that he did not review any of the evidence, interview any of the witnesses, or assist in the investigation of the case in any significant respect. Rather, he received “piecemeal” information which was never verified as to its accuracy.
Rocquel Smith testified that she knew defendant and the victim. She stated that she was visiting the Thomas apartment on the night of the incident. She was outside and “everybody else [Thomas, the victim, defendant, and others] were inside playing a game.” She recalled the victim “coming outside, taking his shirt off, talking about what he was going to do [sic] somebody, and showing a gun and saying he was going to kill [defendant].” Smith testified that the victim and his friend were armed with guns. Defendant and some others followed the victim outside because he was screaming. The victim “just kept going on and on,” then he hit defendant. Thomas and another bystander immediately stepped in between the fight and the victim pulled a gun from his waistband. The victim walked to the left and made a phone call and stated to the person he had called “what they was [sic] going to do to [defendant].” Moments later, the victim and his friend entered |uinto a white Expedition and drove away. The vehicle subsequently returned without the victim.
Smith testified that at this point, defendant walked away heading to the right. Once defendant reached 2313 Alex Kor-man Boulevard, the victim returned on foot with four or five “other boys,” including the victim’s friend. They “jumped out” from between the building and an altercation ensued between the victim and defendant, and the victim produced a gun. The victim’s friend also had a gun. Ms. Smith testified that the victim and defendant began “tussling” over the gun, the gun went off, defendant fell back, and “one of the guys” standing behind the victim started shooting. Defendant did not have or shoot a weapon. Smith testified that she ran into the woods and returned a few minutes later before police arrived and drove home. On cross-examination, Smith testified that she did not know how the victim was shot 17 times, considering that all of the gunfire came from him and “his boys” and was directed at defendant.
Vincent Lamia, the Chief Investigator with the District Attorney’s Office in 2006, testified that he took a statement from Rodrigue on September 12, 2006 in which Rodrigue declared that the victim fired the first shot. On cross-examination, Lamia explained that it was not uncommon for witnesses to a homicide to vacillate between accounts.
Lieutenant Gary Cook testified that he secured a revolver on the ground to the right of the victim. He admitted that Go- *870 rumba’s police report stating that the revolver was in the victim’s right hand when officers arrived on scene is not correct.
Crime scene technician Henry Jaume, testified that both of the victim’s hands tested positive for gunshot residue indicating that he had fired a weapon or was in close proximity to a weapon being fired. The eight, 9-mm casings | ^recovered from the scene also indicated that a 9-mm firearm was discharged at the scene.[8]
Defendant took the stand and testified that he was 46 years old, married, and had been employed as a welder for 15 years. He admitted two previous convictions for simple battery in 1996. Defendant testified that on the day of the shooting, he had been drinking, but he was not armed or attempting to start a fight, nor did he ask Thomas for a gun. Defendant asserted that the victim punched him in the face outside of Thomas’ house, and then Vernon approached him with an automatic weapon, so he punched Vernon and struggled with the gun. After the altercation ended, defendant began walking down Alex Korman Boulevard in an attempt to leave, when the victim and another male, who he had not seen earlier in the night, “ran up on [him].” Defendant explained that he and the second individual “tussled” in the parking lot, fighting over the gun. Defendant commandeered the gun, which was a .357 magnum, from the second individual when he observed the victim shooting at him. Defendant testified that he only fired the .857 magnum because he was being attacked. Defendant stated that he received gunshot wounds in the back, left wrist and leg. He did not know how many shots hit the victim, but it was not 17 shots. Defendant ran down the street until an unknown woman picked him up and assisted him. Defendant stated that he fully cooperated with law enforcement.
On cross-examination, defendant admitted that after the first altercation and pri- or to the shooting, an unknown male offered him a ride but he did not take it.[9] | ^Defendant maintained that he was “jumped” by two men with guns and he was only shot three times, and the 'victim, who was the aggressor, received 17 gunshot wounds. He denied having the .40 caliber gun and further declared that he did not know how his DNA was obtained from that gun. He admitted that when he initially spoke to police, he told them he did not know who shot him because he was scared. He admitted later telling them that it was a possible robbery and that he had not fired a weapon.
At the conclusion of trial, defendant was found guilty as charged. After the denial of his motions for new trial and judgment notwithstanding the verdict, he was sentenced to life imprisonment. This timely appeal followed.

ASSIGNMENTS OF ERROR NUMBERS ONE AND FOUR

The evidence was insufficient to support the verdict in that it failed, to prove 
*871
beyond a reasonable doubt that the killing was not done in self-defense.

The evidence was insufficient to support the verdict of guilty as charged as it proved at best that the killing was a manslaughter done in the heat of passion.

Defendant argues that the evidence was insufficient to support the verdict. He contends that the evidence was insufficient to prove beyond a reasonable doubt that defendant did not act in self-defense. Defendant also contends that due to the mitigating circumstances, the evidence was only sufficient to prove a lesser verdict of manslaughter done in the heat of passion.
The State responds that any rational trier of fact could have found beyond a reasonable doubt that defendant did not act in self-defense. The State further argues that viewing the evidence in a light most favorable to the prosecution, any rational fact finder could have found that the mitigatory factors to justify a verdict of manslaughter were not established by a preponderance of the evidence. 117Specifically, the State contends that insufficient provocation existed and defendant had sufficient time to cool before he returned and committed the murder.
The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kemp-ton, 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. However, this requirement does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. State v. Lathers, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id. (citation omitted).
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or | isreject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier-of-fact, is sufficient to convict. State v. Addison, 00-1730, p. 4 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 613, writ denied, 01-1660 (La.4/26/02), 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence absent impingement on *872 the fundamental due process of law. Bailey, supra.
In the instant case, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight, 09-359, p. 14 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Graves, 99-113, p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00), 759 So.2d 68. “The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.” State v. Gonzalez, 07-449, p. 9 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied, 08-0228 (La.9/19/08), 992 So.2d 949. Whether a defendant possessed the requisite intent in a criminal case is a question [ 19for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. Id.
The State produced two eye witnesses to the shooting, Cason and Ro-drigue, who both stated that defendant, who possessed two guns, fired the first shot. Cason testified that defendant came around the back of the apartments and fired upon the victim, while Rodrigue testified that the victim was standing near his car talking to him when he was shot. Thus, viewing the evidence presented at trial in the light most favorable to the prosecution, we find that the jury could have reasonably inferred that defendant had specific intent to kill or inflict great bodily harm upon the victim.
Manslaughter is a homicide that would be either first or second degree murder, except that the offense was committed in “sudden passion” or “heat of blood” caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31 A(l). “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. State v. Dobbins, 05-342 (La.App. 5 Cir. 12/27/05), 920 So.2d 278, 283-84.
In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434, p. 5 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The question for this Court on review is whether a rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not 12nestablished by a preponderance of the evidence. State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 523.
The jury clearly found that defendant failed to meet his burden of proof that he acted in “sudden passion” or “heat *873 of blood.”[10] The record contains some evidence of provocation, however the jury apparently concluded that defendant acted in retaliation with deliberation and reflection and not from the heat of passion at the time of the actual homicide, which came after defendant had sufficient time to cool. As argued by the State, although our law may extend some limited indulgence to passion justly excited, it does not indulge revenge. State v. Patterson, 10-415, p. 17 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 151, writ denied, 11-0338 (La.6/17/11), 63 So.3d 1037 (citation omitted).
Through the testimony of Walkey, Thomas, Cason, and Rodrigue, the State demonstrated that prior to the shooting the victim and defendant got into a physical altercation in which the victim was the initial aggressor. The testimony indicates that the victim and his friend, Vernon, later approached defendant armed with firearms at which time defendant punched Vernon in the face and turned his back on both the victim and Vernon. Following this incident, defendant requested a gun from Thomas. The testimony also indicates that defendant left the scene in a green Ford F150 and returned through the back of the apartment complex with two weapons and another unknown male and trapped the victim. Defendant fired a “warning shot” and said “Okay, bit* *, what now bit* *?” Thereafter, the victim, defendant, and the unknown male then began firing. The victim was shot five times in the back and received approximately 17 gunshot wounds, counting both entrance and exit wounds. Several of the wounds were received while the victim was either bent over or lying down at the time of infliction.
| ⅞1 Although not in his statement to Davidson or Morales, defendant testified that the victim and an unknown male “jumped out” from the back of the apartments to ambush defendant. Defendant “tussled” with the unknown subject and retrieved his gun when he observed the victim shooting at him and returned fire. He only fired because he was being attacked. He did not know how many shots hit the victim, but it was not 17 shots. Defendant denied ever having the .40 caliber weapon and could not explain how his DNA was retrieved from the weapon. In addition, defendant’s version of the events differed from Smith’s version, who also testified on behalf of the defense. Specifically, Smith testified that a group of the victim’s friends came from behind the apartments and ambushed defendant, who was unarmed, a gun went off, and the one of the victim’s friends started shooting. Whereas, defendant indicated he fired a weapon retrieved from the victim’s friend at the victim after the victim and his unknown male friend (rather than a group) attacked him, and the victim started shooting at him. The jury clearly did not believe defendant, or Smith’s, version of the events. Such a credibility determination should not be re-weighed on appeal. Bailey, supra.
Considering the testimony as to defendant’s actions and the extent of the victim’s injuries, we find that the evidence was sufficient under Jackson to support the jury’s finding that defendant had specific intent to kill or inflict great bodily harm on the victim, and was thus guilty of second degree murder. Moreover, a review of the evidence indicates that a rational trier-of-fact could have rejected the testimony presented by the defense and find that defendant failed to establish the mitigatory factors for a manslaughter verdict.
*874 Defendant does not deny that he “shot at” the victim, but insists that the homicide was justified because he acted in self-defense after the victim and “his |22gang” escalated the altercation, by using deadly force against the outnumbered and unarmed defendant.
The State responds that defendant acted in retaliation rather than in self-defense.
When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Brown, 414 So.2d 726, 728 (La.1982). The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. LSA-R.S. 14:18. According to LSA-R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger” or “[w]hen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.”
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. LSA-R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Theriot, 07-71, p 13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08), 976 So.2d 715. The determination of a defendant’s culpability rests on a two-fold test: 1) whether, given the facts presented, the [^defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. Theriot, 07-71 at 12, 963 So.2d at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. Theriot, 07-71 at 13, 963 So.2d at 1020.
The record reflects that the State adequately negated the defense of justification beyond a reasonable doubt. As previously discussed, the State has proven that although the victim was the aggressor in the prior altercations with defendant, the victim and his friend, although armed, retreated rather than firing, meanwhile defendant was attempting to obtain a gun. Defendant left the scene in a truck and returned on foot armed with two weapons accompanied by another armed male, who both began filing upon the victim.
This evidence indicates that defendant planned to attack the victim, and did so in revenge for the previous assault. As the State correctly points out, “[t]he law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats.” Patterson, supra at 149.
In addition, after firing the warning shot, defendant exclaimed: “what now bi* * * ” as he and his accomplice began firing. Defendant received 17 gunshot wounds, several of which entered in his back and/or were inflicted while he was lying down or bent over. These facts indicate that defendant became the aggressor *875 and his claim of self-defense was unsupported by the facts. See Patterson, 10-415, p. 14, 63 So.3d at 149 (citation omitted).
The State further proved that after the incident, defendant fled from the scene, deserted his weapons, and misled the police on several occasions about the circumstances surrounding the shooting. These actions are inconsistent with a | theory of justifiable homicide. See Patterson, 10-415, 63 So.3d at 150 (citation omitted). As the State notes, a defendant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. Id. (citation omitted).
Based on the foregoing, we find that any rational trier of fact could have reasonably concluded that the State proved beyond a reasonable doubt that defendant did not act in self-defense. Accordingly, we find no merit in defendant’s arguments.

ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE

It was error to refuse to charge the jury with the standard charge on the defense of self-defense and justification.

It was error to refuse to charge the jury with the special requested charge on the defense of self-defense and justification.

Defendant argues that he was deprived of his rights to a jury trial and to present a defense when the trial court erroneously eliminated a section from the standard jury charge. Specifically, the section included three factors which are considered in determining a defendant’s reasonable belief that a killing in self-defense is necessary: excitement and confusion of the occasion, the possibility of using a lesser force, and defendant’s knowledge of the assailant’s bad character. Essentially, defendant claims that the charges were required to be included because they constituted part of the applicable law on self-defense.
Alternatively, defendant argues that when the trial court eliminated the section relative to the factors to be considered in determining reasonable belief for killing in self-defense, it amounted to a rejection of a special requested charge. Defendant contends that the special requested charge was a correct statement ofj^law, pertinent to the case, which required no qualification, limitation, or explanation.
Defendant contends that given the confusing nature of the incident, the jury should have been charged to take excitement and confusion of the occasion into account. Defendant further argues that the jury, not the judge, was to consider whether there was a possibility of using a force short of violence or whether defendant reasonably believed the killing was necessary given the excitement and confusion of the situation. As such, defendant requests reversal of his conviction and remand for a new trial.
The State responds that the record demonstrates that the killing was not committed under circumstances of excitement and confusion because defendant walked out of an alleyway and started shooting at the victim. Rather, the events that would support the language at issue were over well before the killing occurred. As a result, the trial court eliminated the language, concerned that it might have confused the jury under the facts of the case. The State further asserts that defendant did not specifically object to the language relative to defendant’s knowledge of the assailant’s dangerous character and/or the use of force less than killing; therefore, they are deemed waived, but are nevertheless meritless.
The State also points out that the trial court charged the jury in accordance with the statutory provisions of the justifiable *876 homicide statute and argues that the guilty verdict was unattributable to the absence of the language at issue. Rather, the jury rejected the finding of self-defense because the evidence established that the killing was not committed in self-defense. The State concludes that even if there was error in the jury charge, it would not warrant a reversal because there was no prejudice to the substantial rights of the accused.
12fiThe record indicates that prior to issuing the instructions to the jury, defense counsel addressed the court in reference to its “elimination” of a particular section found in the standard jury charge for self-defense related to the factors that are considered in determining whether a defendant has a reasonable belief that the killing was necessary. In return, the State clarified that rather than eliminating anything, the trial court simply presented a jury charge for discussion and there was no “elimination” from the proposed charge as defense counsel suggested. Instead, those sections simply were not made part of the presented charge. The following exchange then took place:
COURT: Right. The standard charge contains the following. Some factors usually considered in determining whether the defendant had a reasonable belief that the killing was necessary are the excitement or confusion of the occasion of possibility [sic] presenting a danger to himself by using force less than killing and the defendant’s knowledge of the assailant’s dangerous character. Those are the standard charges, taken from the official comments of the statute. I think in this case, as the State has argued, that based on the facts of this case, it might confuse the jury, because there was a lot of confusion in the initial incident, but not necessarily at the time of the shooting. So I’m afraid that it might confuse the jury based on the facts of this case, so I’m ordering that just the statute be in the charge.
DEFENSE: And briefly in response, Your Honor, in order to perfect the record as far as that’s concerned, clearly we have multiple encounters, physical confrontation, after which a gun incident, and finally a shooting incident involving multiple individuals. If that is not an incitable incident, then with all due respect I don’t know what is. Respectfully note my objection as to the removal or the failure to read that section to the jury.
LSA-C.Cr.P. art. 802 mandates the judge to charge the jury as to all law applicable to the case. The general language of this article makes all questions of law applicable to a case mandatory charges to be given by the judge to the jury. State v. Miller, 338 So.2d 678, 679 (La.1976). This provision has been interpreted to require the trial judge to charge as to each and every phase of the case arguably ^supported by the evidence, whether or not believed by the judge. Id. (citations omitted).
“A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” LSA-C.Cr.P. art. 807. It follows from these rules that the trial judge is required to charge the jury, in response to an otherwise proper request, as to the law applicable to any theory of defense which a jury could reasonably infer from the evidence. State v. Marse, 365 So.2d 1319, 1323 (La.1978).
It appears that defendant made an oral request for the factors at issue to be in- *877 eluded in the jury instructions.[11] The question then becomes whether the factors, which are considered in determining a defendant’s reasonable belief that killing was necessary, form part of law applicable to the theory of self-defense, thereby requiring such factors to be included in the jury instructions upon defendant’s request.
Defendant contends that the factors at issue form part of the applicable law for self-defense; therefore, the absence of such factors in the juror verdict was error. Defendant cites to this Court’s decision in State v. Necaise, 466 So.2d 660 (La.App. 5 Cir.1985), in support of this position. In Necaise the trial court included several factors in the jury charge including: 1) the possibility of avoiding the necessity of taking human life by retreat; 2) the excitement and confusion of the occasion; 3) the possibility of preventing the danger by using force less than killing; and 4) the defendant’s knowledge of his assailant’s dangerous character. |28The defendant requested the exclusion of the factor that considered the possibility of avoiding the taking of human life by retreat. Id., 466 So.2d at 667. The trial court refused the request and the defendant objected, stating that retreat was not essential under Louisiana law. Id. This Court ultimately upheld the instructions while holding that the possibility of retreat was a factor to be considered when a plea of self-defense is made; therefore, the judge was obligated to include a statement on the possibility of retreat as part of his instruction on the self-defense doctrine. Id.
However, even if we were to conclude that the factors at issue were part of the applicable law and the trial court erroneously failed to include the factors in the jury instructions, defendant is not entitled to the relief sought. A conviction will not be overturned on the grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139. An erroneous instruction is subject to harmless error review. State v. Eskano, 2000-101 (La.App. 5 Cir. 1/30/01), 779 So.2d 148, 155. The appropriate standard for determining harmless error is “ ‘not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the instant trial was surely unattributable to the error.’ ” Id.
In the instant case, the evidence overwhelmingly established that defendant sought revenge upon the victim, and attacked him by surprise, shooting him multiple times with the assistance of another unknown accomplice. Five of the shots were in the victim’s back and occurred while he was either bent over or lying down. The circumstances of this case clearly indicate that defendant became the aggressor, shooting the victim in retaliation for the prior assaults, thereby negating 12c)his claim of self-defense. Additionally, the jury was instructed to consider the statutory elements of self-defense. Therefore, any error as to jury instructions was *878 harmless and unattributable to defendant’s conviction.
Defendant further argues the trial court erred in excluding his requested special charge.[12]
As previously discussed, a requested special charge shall be given by the court if it does not require qualification, limitation or explanation and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge which is given. LSA-C.Cr.P. art. 807; State v. Smith, 414 So.2d 1237 (La.1982). If the requested charge does not conform to the statutory requirements, it need not be given by the court. State v. Nuccio, 454 So.2d 93 (La.1984).
The record reflects that the judge clearly felt that the facts of the case presented the potential of confusion by the jury if the factor involving excitement and confusion of the occasion was included in the jury instruction. The judge explained that there was considerable confusion in the initial incident but not necessarily at the time of the shooting. This concern suggests that the trial court believed it would have had to further explain or limit the application and consideration of that factor to the jury. Accordingly, because the special instruction would have required further explanation or limitation, that the instruction was not required to be given. See LSA-C.Cr.P. art. 807. Moreover, because the charge does not appear to conform to the statutory requirements, it does not appear to be necessary. Richardson, 92-836 (La.App. 5 Cir. 12/14/94), 648 So.2d 945, (citing Nuccio, supra).
[snIn State v. Carter, 1997-2902 (La.App. 4 Cir. 5/10/00), 762 So.2d 662, 685, writ denied, 00-1598 (La.6/15/01), 793 So.2d 1233, which is cited by the State in support of its contention that explanation of the parameters of the charge would have been necessary, the Fourth Circuit found that the trial court was not required to give the factor regarding the excitement and confusion of the occasion as an instruction because the trial court could have felt the instruction needed further explanation that the consideration was under a reasonable person standard rather than defendant’s subjective belief. Further, the general charge incorporated the consideration of excitement of the situation in its instructions regarding justifiable homicide and manslaughter. As a result, the special charge was not required.
Moreover, assuming that the trial court was required to give the instruction, the refusal to give a requested special charge does not warrant reversal of a defendant’s conviction unless it prejudices substantial rights of the accused. LSA-C.Cr.P. art. 921; Richardson, 92-836 at 3, 648 So.2d 945, 947 (citations omitted).
The jury was instructed to consider the requisite statutory elements of self-defense. As such, it was free to consider any and all circumstances surrounding the death. Bailey, 261 So.2d at 586-87. As previously discussed, failure to give such a *879 charge does not warrant reversal because the conviction was unattributable to the absence of the instruction at issue. Rather, the verdict was attributable to the overwhelming evidence that defendant attacked the victim, which negated defendant’s self-defense claim. And as the State mentions, defendant was not prohibited from discussing these factors during closing arguments. Since the jury was sufficiently informed of and considered the statutory elements of self-defense, and it was further free to consider all of the relevant factors surrounding the victim’s death, the failure to include this special instruction, defendant’s |31 substantial rights, including a right to present a defense, were not affected in any way. Accordingly, these assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER FIVE

It was error to exclude documentary evidence appellant sought to introduce which evidence was fundamental to appellant’s defense at trial.

Defendant argues that the trial court erroneously excluded the admission of numerous documents into evidence as hearsay. Defendant specifically challenges the admission of: 1) Penny Cason’s statement, arguing that it was critical in presenting the facts surrounding the victim’s death at a time when the event was fresh in her mind; 2) Michael Rodrigue’s statement, arguing that it was critical in presenting the facts surrounding the victim’s death at a time when the event was fresh in his mind; 3) Deputy Nick Davidson’s police report, arguing that it would have helped the jury better understand the placement of the firearms recovered at the scene, in reference to a claim that one of the firearms was recovered in the victim’s hand; and 4) correspondence authored by Captain Steve Buras, arguing that his statement that the victim would have been charged with attempted murder of defendant had he lived was extremely relevant, reliable, and trustworthy. Defendant does not deny that the documents were hearsay; rather he contends that he is not bound by the rules of evidence because the documents were reliable, trustworthy, relevant, and crucial to his right to present a defense, thereby warranting admission.
The State responds that the trial court did not abuse its discretion in prohibiting admission of the hearsay evidence because there were no exceptional circumstances in the case that warranted their inclusion. The State also argues that the denial did not affect defendant’s substantial rights or otherwise prejudice him, [ S2because the probative value of the material was elicited at trial, where defendant was allowed to cross-examine, and the evidence was merely cumulative of the evidence already admitted at trial.
The record reflects that the trial court denied admission of the documents at issue and defendant proffered the documents for review on appeal.
Both the Sixth Amendment of the United States Constitution and the Louisiana Constitution, Art. I, Section 16 (1974), provide that a criminal defendant has the right to present a defense. Hearsay is “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” LSA-C.E. 801(C). Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. LSA-C.E. art. 802.
Nonetheless, as defendant contends, the Louisiana Supreme Court has recognized that normally inadmissible hearsay may be admitted into evidence if it is reliable, trustworthy, and relevant if its *880 exclusion would interfere with the defendant’s constitutional right to present a defense. State v. Marsalis, 04-827, pp. 11-12 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1088-89 (citing State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 202; State v. Gremillion, 542 So.2d 1074, 1078 (La.1989)). Evidentiary rules may not supersede the fundamental right to present a defense. Van Winkle, supra, (citations omitted).
However, as the State contends, the Supreme Court has noted that this “fairness exception” to the hearsay rule was an unusual exception and should be sparingly applied. Marsalis, supra, (citing State v. Trahan, 576 So.2d 1, 11 (La.1990)). The right to present a defense does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of | ¡¡.justice. Marsalis, supra, (citing State v. Shaw, 00-1051 (La.App. 5 Cir. 2/14/01), 785 So.2d 34, 45, writ denied, 01-0969 (La.2/8/02), 807 So.2d 861). Relevant evidence is “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Marsalis, supra, (citing LSA-C.E. art. 401). A trial judge’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Williams, 03-942 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1010, writ denied, 04-0450 (La.6/25/04), 876 So.2d 832.
As conceded by defendant, the documents he sought to introduce were inadmissible hearsay. There were no circumstances in the instant case that present an unusual exception warranting the admission of otherwise excludable evidence. Further, with respect to the statements of Cason and Rodrigue, both of these witnesses testified for the State and were subject to extensive cross-examination by the defense. As the State points out, Ca-son and Rodrigue’s statements were both used during the course of them testimony. Defendant does not allege any inconsistency in the witness’ statements, which would have warranted them admission; rather he argues that it was critical for the jury to understand the circumstances surrounding the case when the facts were fresh in their minds. Had any inconsistencies surfaced, then the documents would have been admissible to impeach the witnesses under the prior inconsistent statement exception to the hearsay rule. LSA-C.E. art. 607(D)(2). Moreover, it is clear from the record that the statements were used to refresh the witness’ recollections. As such, these statements were not erroneously excluded as they were repetitive of the witness’ testimonies at trial and did not affect defendant’s right to present a defense.
|34With regard to Detective Davidson’s police report stating that two firearms were found in close proximity to the victim, defendant argues that this report would have better allowed the jury to understand the placement of the firearms at the scene: Although this information is trustworthy, relevant, and reliable, it is also duplicative, contains minimal probative value, and is consistent with Davidson’s testimony at trial where he was subject to cross-examination. Accordingly, defendant was not denied any right to present a defense by the omission of Davidson’s report.
Defendant goes on to argue that Captain Steve Buras’ correspondence to two insurance companies, which reflected that the victim would have been charged with the attempted murder of defendant had he lived, was extremely relevant, reliable, and *881 trustworthy. The correspondence also reflected that the victim was one of several aggressors in the incident, which appears to be significant to defendant’s self-defense argument. The record reflects that although the trial court did not feel that Buras’ testimony regarding the correspondence was necessarily reliable, he nevertheless allowed Buras to testify as to his answers over the State’s objection in an effort to avoid a mistrial. As such, the correspondence is another duplicative of the trial record, which does not appear to prejudice the defense because the jury heard and considered the evidence through Buras’ testimony for the defense at trial. Furthermore, it is not disputed by the State that the victim was the aggressor in the initial incident.
Additionally, as the judge originally indicated, this evidence does not appear to be sufficiently reliable nor does it appear to contain substantial probative value. Buras testified that his answers would have been based on his own knowledge or on the knowledge of another investigator involved in the case. On cross-examination, Buras admitted that he did not review any of the evidence, interview 135any of the witnesses, or assist in the investigation of the case in any significant respect. Instead, he received “piecemeal” information which was never verified as to its accuracy. For these reasons, the trial judge properly excluded this evidence. Further, the exclusion of this correspondence did not inhibit defendant’s ability to present a defense because Buras actually testified to his answers at trial.
Accordingly, this assignment of error lacks merit.

ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
The commitment reflects that defendant is to serve his sentence at hard labor with the Department of Corrections, giving credit for time served; however, the transcript is silent in reference to these conditions. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
LSA-R.S. 14:30.1 requires the sentence to be served at hard labor. Since the statute mandates hard labor and there is no discretion allowed, the failure by the trial judge to state that the sentence is to be served at hard labor is harmless error and no correction is required. State v. Horton, 09-250, p. 11 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 377.
In addition, receiving credit for time served is self-operating, pursuant to LSA-C.Cr.P. art. 880. State v. Johnson, 05-180, pp. 10-11 (La.App. 5 Cir. 11/29/05), 917 So.2d 576, 582, writ denied, 06-1254 (La.12/15/06), 944 So.2d 1282. Therefore, no corrective action is necessary.

⅛CONCLUSION

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

AFFIRMED

. The “cut”, apparently slang for shortcut, refers to a grassy area behind the apartments on Alex Korman Boulevard.

. Cason testified that “they felt that they got punked when the big guy (defendant) punched the other guy in his face with a gun in his hand.”

.It was later determined that Michael Ro-drigue was in this vehicle and witnessed the gunfight.

. Max Drive runs parallel to Alex Korman Boulevard. The apartments in front of which this incident took place can be accessed from the rear via the open grassy area that runs from Max Drive to the rear of the apartments.

. Rodrigue testified that defendant had two automatic weapons but admitted that his 2004 statement reflected that one of the guns was a revolver. He also admitted that his memory of the incident was better in 2004.

. Detective Gorumba testified that Penny Ca-son came forward on the day of the incident and Michael Rodrigue was established as a witness through subsequent investigation. Both identified defendant in a photographic lineup.

. Buras read his answer directly from the correspondence and the question to which the answer was in response was not included.

. At the conclusion of Jaume’s testimony, Edward Gai testified that he was hired as an investigator for the defense, and in the course of his employment, he attempted to locate witnesses in the matter. The State objected to the questioning arguing that he was going to testify as to his beliefs about the case. The trial court allowed the questioning to "see where it goes.’’ However, defense counsel abruptly terminated the questioning, asking for his objection to be noted. The State did not question Gai.

. Defendant asserted that the person may have been afraid to bring him home and then explained that he did not know the person and was afraid to leave with him because "he was probably a friend of the perpetrator.” He also admitted that he did not call anyone for a ride nor did he go back into Thomas’ residence.

. The transcript from trial overtly reflects that the jury considered manslaughter as it asked for the definition, then later rescinded the request.

. Although, there is no evidence that defendant submitted a written request for special instructions as required by LSA-C.Cr.P. art. 807, the trial court heard his argument and noted his objection. In addition, the trial court also allowed the State's oral request for special instructions and subsequent objections. Therefore, it appears that the trial court tacitly waived the formal writing requirement. See State v. Haddad, 99-1272, p. 5 (La.2/29/00), 767 So.2d 682, 685-86, cert. denied, 531 U.S. 1070, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001).

. The record reflects that defendant only made a specific objection in reference to the trial court’s refusal to include the factor regarding excitement and confusion of the issue. As such, he did not preserve any issue for failure to instruct the jury on the factors regarding using a force less than killing and knowledge of the victim’s dangerous character for review on appeal. See LSA-C.Cr.P. art. 841; Necaise, 466 So.2d at 667, where this Court found that a new basis for objection cannot be raised for the first time on appeal; State v. Hill, 636 So.2d 999, 1002 (La.App. 5 Cir. 1994), writ denied, 94-3144 (La.9/1/95), 658 So.2d 1259, (citing State v. Henry, 449 So.2d 486 (La.1984), where the court found that counsel’s failure to state the ground of his objection with specificity prevented him from raising the issue on appeal).